## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| MCCAFFREE FINANCIAL CORP. ON BEHALF OF THE MCCAFREE FINANCIAL CORP. EMPLOYEE RETIREMENT PROGRAM, on behalf of a class of those similarly situated,<br><br>                Plaintiff,<br><br>        vs.<br><br>PRINCIPAL LIFE INSURANCE COMPANY,<br><br>                Defendant. | Case No.  4:14-cv-102 |

## CLASS ACTION COMPLAINT

### I.    NATURE OF THE CASE

1.      Plaintiff McCaffree Financial Corp. ("McCaffree"), as administrator of the McCaffree Financial Corp. Employee Retirement Program ("McCaffree Plan"), brings this Complaint because Principal Life Insurance Company ("Principal") has violated several provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by charging grossly excessive investment management and other fees to the participants in the McCaffree Plan and participants in other defined-contribution retirement plans subject to ERISA. As set forth below, this conduct violates ERISA's duties of loyalty and prudence and involves self-dealing transactions prohibited by ERISA.

2.      Principal imposes these overcharges by structuring its retirement investment products as "Separate Accounts," even though these Separate Accounts merely invest in Principal mutual funds.  By structuring its investment products in this way, Principal reaps substantial fees on top of the fees charged by its own mutual funds.  Nothing justifies this extra layer of fees.

3.     McCaffree brings this action to recover these excessive fees and the additional investment gains that would have accrued in the absence of such fees, on behalf of both: (1) the participants and beneficiaries of the McCaffree Plan and (2) the participants and beneficiaries of all defined-contribution retirement plans subject to ERISA during the relevant time period that also paid such excessive fees to Principal.

## II.    PARTIES

4.     McCaffree is a corporation headquartered in Overland Park, Kansas.  McCaffree sponsors an ERISA-governed retirement plan for its employees, the McCaffree Plan, and is the administrator of the McCaffree Plan.

5.     As administrator of the McCaffree Plan, McCaffree is party to a Group Annuity Contract with Principal dated September 1, 2009 (and subsequently amended).

6.     Principal is a life insurance company incorporated under the laws of Iowa and headquartered in Des Moines, Iowa.

7.     Principal is part of the Principal Financial Group, which describes itself as "a leading global financial company offering businesses, individuals and institutional clients a wide range of financial products and services."[1]

8.     The companies that comprise the Principal Financial Group, including Principal, are among the leading service providers to defined-contribution retirement plans such as 401(k) plans and provide services to over 30,000 plan sponsors and 3.4 million participants, with over $116 billion in defined-contribution plan assets under management.[2]

9.     Principal focuses on providing its services to small and medium-sized businesses.

10.    McCaffree brings this action on behalf of the participants and beneficiaries of the McCaffree Plan and as a representative, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all participants and beneficiaries of all defined-contribution retirement

---

[1] www.principal.com/about/index.htm.

[2] www.principal.com/retirement/biz/dcplan.htm.

plans subject to ERISA that invested in Separate Accounts offered by Principal during the relevant time period.

## III.   JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under federal law, ERISA, specifically 29 U.S.C. § 1132(a).  This Court also has jurisdiction pursuant to 29 U.S.C. § 1132(e).

12.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2) because: (1) Principal resides in this district and (2) a substantial part of the events or omissions giving rise to the claim occurred in this district.  Venue is also appropriate in this district pursuant to 29 U.S.C. § 1132(e)(2) because: (1) the breaches alleged herein occurred in part in this district, and (2) Principal resides in this district.

## IV.   FACTS

### A.   THE GROUP ANNUITY CONTRACT AND SEPARATE INVESTMENT ACCOUNT RIDER

13.     Under the Group Annuity Contract, Principal offers a curated menu of investment options for participants in the McCaffree Plan and provides other services in connection with the McCaffree Plan in exchange for various fees and charges.

14.     The Group Annuity Contract contains a Separate Investment Account Rider that allows participants in the McCaffree Plan to invest in Principal's Separate Accounts, as described below.

15.     On information and belief, the Group Annuity Contract including the Separate Investment Account Rider is a form contract and is substantially the same as Principal's contracts with other defined-contribution retirement plans subject to ERISA.

16.     Under the Group Annuity Contract, Principal admits that it is an "Investment Manager" as defined by ERISA with respect to the McCaffree Plan assets managed under the contract and also admits that it is thus an ERISA fiduciary with respect to the McCaffree Plan and those assets.

17.      Under the Separate Investment Account Rider, Principal reserves the right to limit the number of its Separate Accounts available to the contracting plan and/or each beneficiary of the contracting plan.  Principal also reserves the right to allow participation in Separate Accounts in addition to those listed in the Separate Investment Account Rider.

18.      Principal thus selects the Separate Accounts that are made available to each contracting plan and the beneficiaries of each contracting plan.  In connection with such selection, Principal states:

> The Principal understands the fiduciary responsibilities plan sponsors face in developing and monitoring an investment lineup appropriate to help meet the diverse needs of retirement plan participants.  We undertake a rigorous due diligence process as a direct response to this challenge, resulting in a key differentiator – our Sub-Advised Investment Options.[3]

19.      This vaunted "rigorous due diligence process" is apparently (and wrongly) completely indifferent to the fees charged by the investment options Principal selects for its contracted plans.  Remarkably, Principal attempts to disclaim any responsibility for the fees it charges in connection with these investment options.  In a footnote to its description of its investment options, Principal states that "Principal … does not guarantee that any investment option will … include reasonable fees …."[4]

20.      Under the Separate Investment Account Rider, Principal maintains the power to unilaterally set the Management Fee for the Separate Accounts subject to a maximum fee of three percent (for all but one of the Separate Accounts) of the value of the assets in the Separate Accounts and to change the Management Fee at its discretion with 30 days written notice.

---

[3] www.principal.com/retirement/biz/investmentoptions.htm.  The term "Sub-Advised Investment Options" includes the Principal Separate Accounts at issue in this action.  *Id.*

[4] *Id.* at n. 3.

21.    In addition to the unilaterally set Management Fee, Principal also charges Operating Expenses against the assets of the Separate Accounts, expenses such as "custodial fees, transfer taxes, brokerage fees, processing fees, and other taxes and fees associated with the operation of a Separate Account." Separate Investment Account Rider, p. 18. These fees are also set unilaterally as there is no formula or other objective measure for how such Operating Expenses are calculated.

### B.    THE PRINCIPAL SEPARATE ACCOUNTS

22.    A separate account is a professionally-managed investment fund held by an institutional investor or high net worth individual. In theory, separate accounts offer several advantages to pooled investment funds such as mutual funds. Among other things, separate accounts may allow the holder to employ a bespoke investment strategy that differs from the strategy employed by existing mutual funds. Separate accounts also offer the benefit of portability: the same account can be managed by different investment managers so the holder of the separate account can change investment managers with little difficulty, as the assets are held by a third-party referred to as the custodian. As set forth below, these advantages are not applicable to the Principal Separate Accounts, both because the Principal Separate Accounts are not customized in any way and merely invest in Principal mutual funds[5] and because the smaller employers Principal targets do not need or want the level of customization or portability that in theory can be accomplished through separate accounts.

23.    Under the Separate Investment Account Rider, Principal agrees to make available a curated menu of investment options for plan participants that will be chosen from 63 Principal Separate Accounts.

24.    The options made available to participants in the McCaffree Plan are and were: (1) LargeCap Value I Separate Account; (2) LargeCap S&P 500 Index Separate Account;

---

[5] The "Principal mutual funds" described herein are managed by Principal's affiliate, Principal Funds, Inc. Some of these funds are sub-advised by parties that are not affiliated with Principal and others of these funds are sub-advised by another Principal affiliate.

(3) LargeCap Blend II Separate Account; (4) LargeCap Growth II Separate Account; (5) LargeCap Growth I Separate Account; (6) MidCap Value I Separate Account; (7) MidCap S&P 400 Index Separate Account; (8) MidCap Growth Separate Account; (9) SmallCap Value II Separate Account; (10) SmallCap S&P 600 Separate Account; (11) SmallCap Growth I Separate Account; (12) Real Estate Securities Separate Account; (13) International Emerging Markets Separate Account; (14) International I Separate Account; (15) LifeTime Strategic Income Separate Account; (16) LifeTime 2010 Separate Account; (17) LifeTime 2015 Separate Account; (18) LifeTime 2020 Separate Account; (19) LifeTime 2025 Separate Account; (20) LifeTime 2030 Separate Account; (21) LifeTime 2035 Separate Account; (22) LifeTime 2040 Separate Account; (23) LifeTime 2045 Separate Account; (24) LifeTime 2050 Separate Account; (25) LifeTime 2055 Separate Account; (26) LifeTime 2060 Separate Account; (27) Core Plus Bond I Separate Account; (28) Bond and Mortgage Separate Account; and (29) Inflation Protection Separate Account.

25.     Each and every one of these Principal Separate Accounts corresponds with a Principal mutual fund that is otherwise available to retail and institutional investors and each and every one of these Principal Separate Accounts invests solely in the shares of the corresponding Principal mutual fund.

26.     There is little or no benefit to participants in defined-contribution retirement plans from "wrapping" a Principal mutual fund with a Principal Separate Account.  And any such benefit is far outweighed by the additional fees that this structure allows Principal to charge.

27.     Other investment managers for defined-contribution retirement plans routinely offer to participants the option to invest directly in mutual funds.  Such direct investments are typically in a share class with relatively low fees comparable to the institutional share class fees described below.

### C.     THE EXCESSIVE FEES ASSOCIATED WITH THE SEPARATE ACCOUNTS

28.     As set forth above, Principal unilaterally sets its own Management Fee and Operating Expenses in connection with its Separate Accounts.  Principal reserves the right to

charge a Management Fee of up to three percent of the value of assets in the Separate Account (except for the U.S. Property Separate Account, which has a maximum management fee of four percent) and there is no stated limit on the Operating Expenses.

29.     The fees charged by Principal for the Separate Accounts are layered on top of the fees charged by the Principal mutual funds in which the Separate Accounts exclusively invest.

30.     As shown in Table I below, this extra layer of fees significantly reduces the net return to participants.  Column 2 shows the reported net return for the listed Principal Separate Account for the McCaffree Fund in 2012.  Column 3 shows the net return for the institutional share class of the corresponding Principal mutual fund in the same year.  Column 4 shows the difference in net return.

**Table 1**

| Separate Account | Column 2: 2012 Net Return | Column 3: 2012 Net Return for Corr. Mutual Fund (Inst.) | Column 4: Difference |
|---|---|---|---|
| Bond and Mortgage | 06.14 | 07.35 | 1.21 |
| Strategic Income | 07.82 | 09.46 | 1.64 |
| LifeTime 2025 | 13.50 | 15.23 | 1.73 |
| LifeTime 2035 | 14.61 | 16.36 | 1.75 |
| LifeTime 2040 | 14.91 | 16.66 | 1.75 |
| LifeTime 2045 | 15.31 | 17.07 | 1.76 |
| LargeCap S&P 500 Index | 14.08 | 15.73 | 1.65 |
| SmallCap Growth I | 12.90 | 14.63 | 1.73 |
| MidCap Value I | 16.08 | 17.85 | 1.77 |
| MidCap S&P 400 Index | 15.89 | 17.65 | 1.76 |
| International Emerging Markets | 19.07 | 20.80 | 1.73 |

31.     Thus, for these Separate Accounts, Principal in effect charges participants an extra fee of between 1.21 percent (121 basis points) and 1.77 percent (177 basis points) simply for wrapping its Separate Accounts around its own mutual funds.  Principal's other Separate Accounts

have similar spreads between the net return for the Separate Account and the net return for the corresponding mutual fund.

32.     No value-added services provided by Principal in connection with its Separate Accounts justify these exorbitant spreads. Principal adds an additional layer of fees on top of the fees its affiliates already obtain for managing the mutual funds for one reason: because it can.

33.     The Institutional Share Class itself charges a fee, and the return shown is net of that value. Table II shows the total effective fee for each of the listed Separate Accounts. Column 2 identifies the fee that is already being charged by a Principal affiliate for managing the mutual fund. Column 3 then calculates the effective fee being paid by a participant by adding the implied Principal Separate Account fee with the fee of the underlying Principal mutual fund (taken from Column 4 of Table I). In most cases, this total fee is in the range of 1.74 to 2.98 percent.

**Table II**

| Separate Account | Column 2: Effective Fee for Separate Account (Column 4 of Table I) | Column 3: Fee of Institutional Share Class | Column 4: Total Effective Fee |
|---|---|---|---|
| Bond and Mortgage | 1.21 | 0.53 | 1.74 |
| Strategic Income | 1.64 | 0.63 | 2.27 |
| LifeTime 2025 | 1.73 | 0.74 | 2.47 |
| LifeTime 2035 | 1.75 | 0.77 | 2.52 |
| LifeTime 2040 | 1.75 | 0.78 | 2.53 |
| LifeTime 2045 | 1.76 | 0.79 | 2.55 |
| LargeCap S&P 500 Index | 1.65 | 0.16 | 1.81 |
| SmallCap Growth I | 1.73 | 1.08 | 2.81 |
| MidCap Value I | 1.77 | 0.99 | 2.76 |
| MidCap S&P 400 Index | 1.76 | 0.25 | 2.01 |
| International Emerging Markets | 1.73 | 1.25 | 2.98 |

34.    To put it another way, the managers and sub-advisors of the Principal mutual funds in which the Principal Separate Accounts exclusively invest provide all the day-to-day investment management services for the underlying mutual funds.  They are already well-compensated for these services by the management fees (ranging from 53 basis points to 125 basis points) set forth in Column 3 of Table II.

35.    Wrapping the Separate Accounts around these mutual funds requires no additional investment management and only minimal additional operating expense.

36.    Although some administrative charges may be reflected in the spreads set forth above, such charges account for very little of the spreads.  In addition to the Management Fee and Operating Expenses described above, Principal charges a variety of what it describes as Administration Charges that may (depending on the plan sponsors' election) be charged against the participants' accounts and thus reduce their net return.  Such charges include: (1) a charge of between $30 and $35 annually for each participant that invests in a Separate Account; and (2) a one-time $600 contract charge plus annual charges between $1400 and $1800.  These administrative charges account in total for a miniscule portion of the spread between the net returns of the Principal Separate Accounts and the corresponding Principal mutual funds.

37.    Under the Group Annuity Contract, participants may convert their account balances into annuities.  This feature also does not justify the spread between the net returns of the Principal Separate Accounts and the corresponding Principal mutual fund because Principal imposes a separate charge for expenses associated with administering the annuity upon conversion.

38.    The exorbitant fees charged by Principal in connection with its Separate Accounts are especially egregious in light of the Principal Financial Group's size and market share.  As set forth above, the Principal Financial Group manages more than $116 billion in defined contribution plan assets.  This allows Principal to achieve substantial economies of scale in managing, operating, and administering the investments in these plans, including the Separate Accounts.  The

obvious savings from such economies of scale are retained by Principal rather than being passed along to its customers.

### D. THE COMPOUNDING INJURY TO PLAN PARTICIPANTS OVER TIME

39.     The participants and beneficiaries of the defined-contribution retirement plans that offer Principal Separate Accounts are injured in at least two ways by the excessive fees imposed in connection with those accounts.  First, they are overcharged for the management, operation, and administration of the Separate Accounts and this directly reduces their investment returns on a monthly basis.  Second, because these fees are taken off the top of their investment returns, they lose the benefit of the additional compounded returns they would have received over time had they been charged reasonable fees.

40.     As the Department of Labor notes in a publication aimed at 401(k) plan participants, "[w]hile contributions to your account and the earnings on your investments will increase your retirement income, fees and expenses paid by your plan may substantially reduce the growth in your account which will reduce your retirement income."[6]  The DOL further calculates that a one percent increase in fees will reduce a participant's account balance by 28 percent over 35 years.

41.     The following chart shows how fees that are excessive by one percent (100 basis points) will harm a plan participant over time.

---

[6] U.S. Department of Labor, *A Look at 401(k) Plan Fees*, August 2013.



42.     This chart is based on a 25-year-old employee who starts working with a salary of $50,000, contributes seven percent of his or her growing salary to a retirement plan, and obtains a six percent gross investment return.  If fees were reduced from 2 ½ percent to 1 ½ percent, the balance at age 65 would grow to $536,000 – nearly 25 percent more wealth.  This would allow for an annuity payment of nearly $33,000 per year, as opposed to an annuity payment of $27,000 per year with the higher fee.  Alternatively, with the lower fee, the participant could choose the same annuity ($27,000) as he or she would receive with the higher fee, but the account balance at age 84 would decline to just $328,000.   A participant could thus choose between a higher retirement income or leaving a sizeable inheritance.

## V.     CLASS ALLEGATIONS

43.     McCaffree brings this matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

44.     McCaffree seeks to represent a class defined as follows:

> All participants and beneficiaries of defined-contribution retirement
> plans subject to ERISA who invested in any Separate Account

11

investment fund offered by Principal from six years before the filing

of this action until the time of trial (the "Class").

45.     The members of this Class are so numerous that joinder of all members is impracticable.  The exact number of members is unknown to McCaffree but is readily ascertainable from Principal's business records.  McCaffree reasonably believes that the class numbers in the hundreds of thousands at least because: (1) the Principal Financial Group provides services to 3.4 million participants in defined-contribution retirement plans; and (2) Principal's Separate Accounts appear to be a primary focus of the Principal Financial Group's marketing for its defined-contribution retirement plan services.

46.     The claims of the participants and beneficiaries of the McCaffree Plan and the proposed class members have a common origin and share a common basis.  All members of the Class suffered from the same misconduct, overcharges in connection with Principal's Separate Accounts, and suffered a common type of injury, payment of such overcharges and the concomitant diminution in their retirement savings over time.  The many questions of law and fact common to the Class include, but are not limited to:

a.     whether and to what extent Principal was a fiduciary under ERISA;

b.     whether, as a fiduciary, Principal was obligated to select only those investment options that charged reasonable fees;

c.     whether the fees charged by Principal in connection with the Separate Accounts were reasonable;

d.     whether Principal breached its duty of loyalty by selecting investment options with unreasonably high fees for Principal's benefit rather than for the benefit of plan participants;

e.     whether Principal breached its duty of prudence by offering investment options with unreasonably high fees to plan participants;

f.     whether Principal engaged in prohibited transactions under ERISA by charging unreasonably high fees;

12

g.      whether Principal's alleged breaches of fiduciary duty and prohibited transactions injured the members of the Class; and

h.      what remedies are appropriate for Principal's breaches of fiduciary duty, if any.

47.      The claims of the participants and beneficiaries of the McCaffree Plan are typical of those of the members of the Class.  All members of the Class would proceed under the same legal theories based on the same facts and pursue the same remedies.  There are no facts specific to the McCaffree Plan that would render the participants and beneficiaries of that plan atypical of the members of the Class.

48.      McCaffree will fairly and adequately protect the interests of the members of the Class.  McCaffree has no interests that are, or would be, antagonistic to those of the members of the Class.  McCaffree is represented by counsel who are experienced in ERISA class actions and other complex litigation and have the resources to prosecute this case as a class action.

49.      Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1) because: (1) prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Principal and/or (2) prosecution of separate actions by individual members of the Class would, as a practical matter, be dispositive of the interest of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.  As a practical matter, the structure of the investment offerings and the fees associated with such offerings must be uniform across the thousands of small-to-medium-sized ERISA plans for whom Principal offers Separate Accounts.

50.      Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Principal has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.  Principal has a uniform policy and practice of charging excessive fees in connection with its Separate Accounts.

51.     Finally, class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because the common issues of law and fact set forth above predominate over questions affecting only individual members of the Class.  The only individualized issues will be the amount of damage each member of the Class incurred from Principal's overcharges and such damages can be readily calculated based on business records maintained by Principal.  Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. This is a classic example of a case where a defendant obtains wrongful profits through overcharges that are, on an individual level, small and difficult to detect but in the aggregate are enormous.  It would make no economic sense for any injured party to pursue this action on an individual basis. Even at the plan level, most of Principal's customers are small-to-medium-sized businesses that would have an insufficient stake in the outcome of this matter to devote substantial resources to pursuing it solely for the benefit of that plan's participants.

## COUNT I: VIOLATION OF ERISA § 404(a)(1)(A)

## BREACH OF THE DUTY OF LOYALTY

52.     Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A), provides that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administrating the plan."

53.     Principal is an ERISA fiduciary with respect to the ERISA plans for which it offers Separate Accounts in at least three respects.

54.     First, as Principal admits in the Group Annuity Contract, it is an "Investment Manager" as defined by ERISA with respect to plan assets managed under the contract and is thus an ERISA fiduciary with respect to the plans and such assets pursuant to 29 U.S.C. § 1002(21)(A)(ii).

55.     Second, Principal "exercises … discretionary authority or discretionary control respecting the management" of plans for which it offers Separate Accounts and "exercises … authority or control respecting management or disposition of its assets" pursuant to 29 U.S.C.

§ 1002(21)(A)(i).  Principal has the discretion to choose which Separate Accounts are offered to each plan and the participants in each plan and has the further discretion to add additional Separate Accounts.   Indeed, Principal represents that it exercises "due diligence" in choosing such investment options as a "direct response" to the "challenge" faced by plan sponsors of "developing and monitoring an investment lineup appropriate to help meet the diverse needs of retirement plan participants."[7]   Furthermore, Principal has discretionary authority or control of both the management and assets of the plans in that it unilaterally sets the Management Fee and Operating Expenses for its Separate Account products and such charges relate to the management of the plans and reduce the assets of the plans.

56.    Third, Principal "has … discretionary authority or discretionary responsibility in the administration" of plans for which it offers Separate Accounts pursuant to 29 U.S.C. § 1002(21)(A)(iii) because, as set forth above, it has authority to decide what Separate Account products are offered and how much will be charged to participants for such products.

57.    By charging substantial fees for its Separate Accounts on top of the fees already charged by its mutual funds, while providing little or no additional value for such fees, Principal acted in its own interests and the interests of its affiliates rather than in the interests of participants and beneficiaries of the plans for which it offers Separate Accounts.  While a fiduciary may also consider the need to defray the "reasonable expenses" of the plan, the fees charged by Principal in connection with its Separate Accounts were manifestly unreasonable and far in excess of what was required to defray actual expenses incurred by Principal for administering the Separate Accounts.

58.    A loyal fiduciary in Principal's position would offer only those investment products with the lowest fees and offer products with higher fees only when there were clear benefits to plan participants sufficient to justify the higher fees.  There are no such benefits here.

59.    Thus, Principal breached its fiduciary duty of loyalty contrary to Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A).

---

[7] www.principal.com/retirement/biz/investmentoptions.htm.

60.     As a direct and proximate cause of Principal's breach of the duty of loyalty, Plaintiff and the members of the Class were injured by: (1) the amount of the excessive fees; and (2) the diminution in their investment returns over time caused by such excessive fees.

61.     Pursuant to ERISA § 409(a), 29 U.S.C. §1109, and ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiff and the Class are entitled to recover from Principal "any losses to the plan[s] resulting" from the breach and to require Principal to "restore to such plan[s] any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary."

62.     Pursuant to ERISA § 409(a), 29 U.S.C. §1109, and ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class are also entitled to enjoin any further breach by Principal and to obtain other appropriate equitable relief.

## COUNT II: VIOLATION OF ERISA § 404(a)(1)(B)

## BREACH OF THE DUTY OF PRUDENCE

63.     Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B), provides that a fiduciary shall act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

64.     As set forth above, Principal is an ERISA fiduciary with respect to the ERISA plans for which it offers Separate Accounts pursuant to 29 U.S.C. § 1002(21)(A)(i),(ii), & (iii).

65.     By charging substantial fees for its Separate Accounts on top of the fees already charged by its mutual funds, while providing little or no additional value for such fees, Principal did not act with the "care, skill, prudence, and diligence" that a prudent man would have exercised in selecting investment options for a retirement plan.

66.     A prudent fiduciary in Principal's position would offer only those investment products with the lowest fees and offer products with higher fees only when there were clear benefits to plan participants sufficient to justify the higher fees.  There are no such benefits here.

67.     Thus, Principal breached its duty of prudence contrary to Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B).

16

68.     As a direct and proximate cause of Principal's breach of the fiduciary duty of prudence, Plaintiff and the members of the Class were injured by: (1) the amount of the excessive fees; and (2) the diminution in their investment returns over time caused by such excessive fees.

69.     Pursuant to ERISA § 409(a), 29 U.S.C. §1109, and ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiff and the Class are entitled to recover from Principal "any losses to the plan[s] resulting" from the breach and to require Principal to "restore to such plan[s] any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary."

70.     Pursuant to ERISA § 409(a), 29 U.S.C. §1109, and ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class are also entitled to enjoin any further breach by Principal and to obtain other appropriate equitable relief.

## COUNT III: VIOLATION OF ERISA § 406(b)(1)

## PROHIBITED TRANSACTIONS

71.     Section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1), prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."

72.     As set forth above, Principal is an ERISA fiduciary with respect to the ERISA plans for which it offers Separate Accounts pursuant to 29 U.S.C. § 1002(21)(A)(i),(ii), & (iii).

73.     By charging substantial fees for its Separate Accounts on top of the fees already charged by its mutual funds, while providing little or no additional value for such fees, Principal dealt with plan assets in its own interest and for its own account because such fees were paid to Principal and its affiliates from the assets of the plans.

74.     Pursuant to Section 408(c)(2) of ERISA, 29 U.S.C. § 1108(c)(2), the prohibited transaction bar does not apply to the fiduciary "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan."   The compensation obtained by Principal in connection with its Separate Accounts was far from reasonable and does not reflect reimbursement for actual expenses because the Separate Account fees obtained by Principal on top of the mutual fund fees do not

reflect sufficient additional value or expense to justify the size of such fees.  Furthermore, this exemption does not apply where the fiduciary, as Principal did here, sets its own compensation.

75.     Thus, Principal engaged in prohibited transactions contrary to Section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1).

76.     As a direct and proximate cause of Principal's engaging in prohibited transactions, Plaintiff and the members of the Class were injured by: (1) the amount of the excessive fees; and (2) the diminution in their investment returns over time caused by such excessive fees.

77.     Pursuant to ERISA § 409(a), 29 U.S.C. §1109, and ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiff and the Class are entitled to recover from Principal "any losses to the plan[s] resulting" from the prohibited transactions and to require Principal to "restore to such plan[s] any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary."

78.     Pursuant to ERISA § 409(a), 29 U.S.C. §1109, and ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class are also entitled to enjoin any further prohibited transactions by Principal and to obtain other appropriate equitable relief.

WHEREFORE, Plaintiff prays for relief as follows:

A.     A determination that this action is a proper class action and certification of proposed Class, with Plaintiff as class representative and its counsel as class counsel, pursuant to Federal Rule of Civil Procedure 23.

B.     A declaration that Defendant breached its ERISA duties to the Plaintiff and the Class.

C.     An order compelling the Defendant to make good to Plaintiff (on behalf of the participants and beneficiaries of Plaintiff's plan) and the Class the losses resulting from Defendants' breaches of their fiduciary duties; and to disgorge for the benefit of Plaintiff (on behalf of the participants and beneficiaries of Plaintiff's plan) and the Class all monies Defendant made through its wrongful use of Plaintiff's and the Class' assets;

D.      Imposition of a constructive trust on any amounts by which Defendant was unjustly enriched at the expense of Plaintiff and the Class as a result of the aforementioned ERISA violations;

E.      An award of costs against Defendant pursuant to 29 U.S.C. § 1132(g);

F.      An award of attorneys' fees against Defendant pursuant to 29 U.S.C. § 1132(g) and other law;

G.      An award for equitable restitution and other appropriate equitable and injunctive relief against Defendant; and

H.      An award of such other and further relief as the Court deems just and proper.


Dated:  March 18, 2014.

                                        Respectfully submitted,

                                        GUNDERSON SHARP, LLP


                                         /s/ Joseph R. Gunderson
                                        Joseph R. Gunderson, Esq.   AT0003031
                                        321 E. Walnut Street, Suite 300
                                        Des Moines, IA  50309
                                        Telephone:  (515) 288-0219
                                        Facsimile:  (515) 288-0328
                                        Email:  jgunderson@midwest-law.com

                                        John M. Edgar *(Pro Hac Vice to be filed)*
                                        **EDGAR LAW FIRM LLC**
                                        1032 Pennsylvania Avenue
                                        Kansas City, Missouri 64105
                                        Tel: (816) 531-0033
                                        Fax: (816) 531-3322
                                        jfe@edgarlawfirm.com
                                        jme@edgarlawfirm.com

Garrett W. Wotkyns *(Pro Hac Vice to be filed)*
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0143
Facsimile: (866) 505-8036


Jason H. Kim *(Pro Hac Vice to be filed)*
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
180 Montgomery Street, Suite 2000
San Francisco, California  94104
Tel: (415) 421-7100
Fax: (415) 421-7105
jkim@schneiderwallace.com

**ATTORNEY FOR PLAINTIFFS**