IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| MCCAFFREE FINANCIAL CORP. ON BEHALF OF THE MCCAFFREE FINANCIAL CORP. EMPLOYEE RETIREMENT PROGRAM, on behalf of a class of those similarly situated, | ) ) ) ) ) | Case No. 4:14-cv-00102-SMR-HCA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRINCIPAL LIFE INSURANCE COMPANY, | ) ) | ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

This is a case brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  In all cases such as this, the threshold question is the same: whether the alleged fiduciary was acting as a fiduciary when taking the action subject to the complaint.  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  Plaintiff McCaffree Financial Corp. alleges Defendant Principal Life Insurance Company is a fiduciary under three subsections of 29 U.S.C. § 1002(21)(A)(i)–(iii).  [Compl. ¶ 53, ECF No. 1].  Raising two arguments, Defendant contends it is not a fiduciary.  [Defendant's  Motion to Dismiss ("Def.'s Mot. to Dismiss"), ECF No. 34; Def. Principal Life Ins. Co.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Br.") at 3–11, ECF No. 34-1].  Because the Court concludes Defendant was not acting as a fiduciary at the time the fees and expenses were negotiated, Defendant is not a fiduciary under 29 U.S.C. § 1002(21)(A)(i).  This conclusion is not dispositive of all Plaintiff's allegations, however, so the Court must consider Defendant's second argument for dismissal.  Because the Court concludes the remaining acts alleged

to support fiduciary status lack a "nexus" with the alleged excessive fees, Defendant is not a fiduciary under § 1002(21)(A)(ii) or § 1002(21)(A)(iii).  Accordingly, the Court grants Defendant's Motion to Dismiss.

### A. Procedural Background of this Motion

Defendant moves to dismiss the Class Action Complaint ("Complaint") with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  [Def.'s Mot to Dismiss at 1].  Plaintiff filed a response ("Pl.'s Br.") [ECF No. 42], and Defendant filed a reply [ECF No. 43].  Defendant requested oral argument, which was held on October 23, 2014.  [ECF No. 51; *see also* Transcript, ECF No. 52].  Before oral argument was held, Defendant filed supplemental authority [ECF No. 47], and Plaintiff filed objections [ECF No. 48].  Also, Defendant clarified previously cited authority [ECF No. 49], and Plaintiff responded [ECF No. 50].  The matter is fully submitted.

## II.  STANDARD OF REVIEW

### A. General Principles Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides a motion to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To meet this standard, and thus survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir.

---

[1] Before the Motion to Dismiss was filed, the Court filed an Order to Show Cause Why Complaint Should Not Be Dismissed for Lack of Federal Subject Matter Jurisdiction [ECF No. 29]. After reviewing Plaintiff's response [ECF No. 35], the Court is satisfied subject matter jurisdiction exists in this case under 28 U.S.C. § 1331.

2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although the plausibility standard "is not akin to a 'probability requirement,'" it does demand "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)).

Several principles guide courts assessing whether a complaint states a plausible claim for relief. *Braden*, 588 F.3d at 594.  Courts must accept as true a plaintiff's factual allegations, but they need not accept as true a plaintiff's legal conclusions. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010).  Courts must draw all reasonable inferences in favor of plaintiffs. *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Still more principles guide courts.  Courts may look to documents attached to or incorporated within a complaint "to determine whether a plaintiff has stated a plausible claim." *Brown*, 628 F.3d at 459–60.  And instead of parsing complaints to determine whether isolated allegations are plausible, courts should read complaints as a whole. *Braden*, 588 F.3d at 594.  After all, evaluating a complaint "is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Consistent with these principles, the Supreme Court of the United States has developed a two-pronged approach for deciding whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 679.  First, courts should begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*  After disregarding these

conclusions, courts should assume the veracity of the remaining factual allegations and "determine whether they plausibly give rise to an entitlement to relief." *Id.* "The facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level.'" *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) (quoting *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009)).

### B. Principles Specific to Rule 12(b)(6) Motions in ERISA Cases

This ERISA case implicates other important tenets. Mindful of Congress's intent to give individuals "an important role in enforcing ERISA's fiduciary duties," the United States Court of Appeals for the Eighth Circuit has instructed courts to "be cognizant of the practical context of ERISA litigation." *Braden*, 588 F.3d at 598. Courts must take account of plaintiffs' generally limited access to information at the pleading stage. *Id.* Courts must not forget the effect of requiring plaintiffs, in order to successfully state a claim, to plead "facts which tend systemically to be in the sole possession of defendants." *Id.* If courts require plaintiffs to plead such facts to state a claim, ERISA's remedial scheme will fail. *Id.* If the remedial scheme fails, "the crucial rights secured by ERISA will suffer." *Id.* Hence, before concluding an ERISA complaint's factual allegations "do not support a plausible inference that the plaintiff is entitled to relief," courts must perform a "careful and holistic evaluation" of those allegations. *Id.*

### III. FACTS

Accepting the truth of Plaintiff's factual allegations, as the Court must at this stage, *Brown*, 628 F.3d at 459, the relevant facts are as follows: Plaintiff sponsors for its employees a retirement plan governed by ERISA, the McCaffree Financial Corp. Employee Retirement Program

("McCaffree Plan") (a 401(k) plan).[2]   [Compl. ¶¶ 1, 4].   Plaintiff is the administrator of the

McCaffree Plan.  *Id.*  Defendant is a life insurance company and is part of Principal Financial Group.

*Id.* ¶¶ 6–7.  Defendant provides services to 401(k) plans.  *Id.* ¶ 8.

Plaintiff and Defendant entered into a "Group Annuity Contract" dated September 1, 2009

(and subsequently amended).  *Id.* ¶ 5.  Under this contract, Defendant offers investment options for

participants in the McCaffree Plan and provides other services in connection with the Plan in

exchange for various fees and charges.  *Id.* ¶ 13.  The Group Annuity Contract includes a "Separate

Investment Account Rider" that allows participants in the McCaffree Plan to invest in Defendant's

"Separate Accounts."  *Id.* ¶ 14.[3]  Under the Separate Investment Account Rider, Defendant agrees

to make available a curated menu of investment options that will be chosen from 63 separate

accounts.  *Id.* ¶ 23; [*see also* Def.'s Mot. to Dismiss, Ex. A, Separate Investment Account Rider at

1–2; ECF No. 34-3].  Defendant reserves the right to limit both the number of separate accounts

available under the contract and the number available to each Member.  [Compl. ¶ 17; Separate

Investment Account Rider at 1].  Defendant also reserves the right to allow participation in separate

accounts in addition to those listed in the Separate Investment Account Rider.  [Compl. ¶ 17].

Plaintiff, for its part, "may send [Defendant] Written Notification indicating you want the contract

---

[2] "So-called 401(k) plans are, more formally, private, employer-based defined-contribution retirement plans that meet the requirements of Internal Revenue Code Section 401(k)." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013) (citing 26 U.S.C. § 401(k)).

[3] A "separate account" is a professionally managed investment fund held by an institutional investor or high-net-worth individual. [Compl. ¶ 22]. As described in *Leimkuehler*, "state insurance law and ERISA require [insurance companies] to keep retirement contributions separate from other assets." 713 F.3d at 908.

administered so that assets held under this contract will not participate in one or more of these Separate Accounts." [Separate Investment Account Rider at 2].

The Separate Investment Account Rider describes "Operating Expenses" and "Management Fees." Plaintiff alleges Defendant unilaterally sets its own Management Fee and Operating Expenses in connection with its separate accounts. [Compl. ¶ 28]. The Management Fee under each separate account "will be a percentage of the value of assets in such Separate Account, subject to the equivalent of a maximum annual percentage listed in the Table of Separate Account Features." [Separate Investment Account Rider at 18]. In other words, Defendant maintains the power to unilaterally set the Management Fee for the separate accounts, subject to a maximum fee of 3% (except for one of the separate accounts), and to change the Management Fee at its discretion by giving at least 30 days' written notice. *Id.* at 18, 27–31; [Compl. ¶¶ 20, 28]. The current Management Fees are listed in the contract. [Separate Investment Account Rider at 27–31 (Table of Separate Account Features)]. Management Fee is "the charge consisting of the investment Management Fee and the contract expense charge applicable to this class of contracts for each Separate Account." *Id.* at 19.

Defendant also charges Operating Expenses against the assets of the separate accounts. *Id.* at 18. Operating Expenses are "those charges which must be paid in order to operate a Separate Account or obtain investments for a Separate Account." *Id.* Operating Expenses include, but are not limited to, custodial fees, transfer taxes, brokerage fees, processing fees, and other taxes and fees associated with operating a Separate Account. *Id.*; [Compl. ¶ 21]. These expenses are also set unilaterally, as there is no formula or other objective measure for how they are calculated. [Compl. ¶ 21]. There is no stated limit on the Operating Expenses. *Id.* ¶ 28.

For participants in the McCaffree Plan, there are 29 options for separate accounts, and these are also selected by Defendant. *Id.* ¶¶ 24, 18. Each of these separate accounts corresponds with a Principal mutual fund that is otherwise available to retail and institutional investors. *Id.* ¶¶ 25, 2. Each separate account invests solely in shares of the corresponding mutual fund. *Id.* ¶ 25. Plaintiff alleges there is little or no benefit to participants from "wrapping" a Principal mutual fund with a Principal separate account, and any such benefit is far outweighed by the additional fees this structure allows Defendant to charge. *Id.* ¶ 26. The fees Defendant charges for the separate accounts are layered on top of the fees charged by the Principal mutual funds in which the separate accounts exclusively invest. *Id.* ¶ 29. By structuring its investment products in this way, Defendant reaps substantial fees on top of the fees charged by its own mutual funds. *Id.* ¶ 2. According to Plaintiff, nothing justifies this extra layer of fees, and it significantly reduces the net return to participants. *Id.* ¶¶ 2, 30. No value-added services provided by Defendant in connection with its separate accounts justify what, in Plaintiff's terms, are "exorbitant spreads." *Id.* ¶ 32. The managers and sub-advisors of the Principal mutual funds in which the Principal separate accounts exclusively invest provide all the day-to-day investment management services for the underlying mutual funds. *Id.* ¶ 34. They are already well-compensated for these services by the management fees. *Id.* Wrapping the separate accounts around these mutual funds requires no additional investment management and only minimal additional operating expense. *Id.* ¶ 35.

The Group Annuity Contract also includes the "Accumulation Group Annuity Endorsement Rider." That rider states in part:

> Application for and issuance of this contract constitutes appointment of and acceptance and affirmation by us that (i) we are an "investment manager" as described under the Employee Retirement Income Security Act of 1974 (ERISA) solely with respect to Plan

> assets held in Separate Accounts under this contract, except for the right reserved in the preceding paragraph and (ii) we are qualified to accept such appointment and acknowledge that by virtue of such appointment we are a fiduciary of the Plan for this purpose, within the meaning of ERISA with respect to our responsibilities as investment manager.

[Def.'s Mot. to Dismiss, Ex. A, Accumulation Group Annuity Endorsement Rider at 6; *see also* Compl. ¶ 16].

> Additionally, Defendant's website states in part:

> > The Principal® understands the fiduciary responsibilities plan sponsors face in developing and monitoring an investment lineup appropriate to help meet the diverse needs of retirement plan participants.  We undertake a rigorous due diligence process as a direct response to this challenge, resulting in a key differentiator—our **Sub-Advised Investment Options**.

[Pl.'s Br., Ex. A, ECF No. 42-2 (emphasis in original); Compl. ¶ 18].  The term "Sub-Advised Investment Options" includes the Principal separate accounts at issue in this action.  [Pl.'s Br., Ex. A; Compl. ¶ 18 & n.3].  Defendant also states that its Sub-Advised Investment Options are "designed to be appropriate for retirement savings under employer-sponsored plans" and that it has "fiduciary oversight and the ability to oversee the investment manager selection and ongoing monitoring process."  [Pl.'s Br., Ex. A].

Plaintiff contends Defendant violated ERISA by charging grossly excessive investment management and other fees to the participants in the McCaffree Plan and participants in other defined-contribution retirement plans subject to ERISA.  [Compl. ¶ 1].  Plaintiff contends this conduct violates ERISA's duties of loyalty and prudence and involves self-dealing transactions prohibited by ERISA.  *Id.*  Plaintiff filed a three-count Class Action Complaint.  Count I alleges a Breach of the Duty of Loyalty in violation of ERISA, 29 U.S.C. § 1104(a)(1)(A).  *Id.* ¶¶ 52–62.

Count II alleges a Breach of the Duty of Prudence in violation of ERISA, 29 U.S.C. § 1104(a)(1)(B).

*Id.* ¶¶ 63–70.   Count III alleges Prohibited Transactions in violation of ERISA, 29 U.S.C.

§ 1106(b)(1).  *Id.* ¶¶ 71–78.  Plaintiff seeks damages and injunctive relief on behalf of both: (1) the

participants and beneficiaries of the McCaffree Plan and (2) the participants and beneficiaries of all

defined-contribution retirement plans subject to ERISA during the relevant time period who also

paid the alleged excessive fees to Defendant.  *Id.* ¶ 3.

## IV.  DISCUSSION

### A.  ERISA Background

ERISA, the Supreme Court has observed, "is a 'comprehensive and reticulated statute,' the

product of a decade of congressional study of the Nation's private employee benefit system." *Great-*

*West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (quoting *Mertens v. Hewitt*

*Assocs.*, 508 U.S. 248, 251 (1993)).  ERISA was "designed to promote the interests of employees

and their beneficiaries in employee benefit plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90

(1983); *see Arkansas Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1343 n.1

(8th Cir. 1991) ("ERISA . . . sets certain uniform standards and requirements for employee benefit

plans."); *see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 26 (2d

Cir. 2002) ("ERISA was enacted in order to protect employee pension and retirement plans.").

ERISA establishes "'standards of conduct, responsibility, and obligations for fiduciaries.'"

*Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 906–07 (8th Cir. 2005)

(quoting *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 628 (8th  Cir. 2001)); *Varity Corp.*

*v. Howe*, 516 U.S. 489, 496 (1996) (explaining ERISA sets "forth certain general fiduciary duties

applicable to the management of" retirement plans).

## B.  Fiduciary Status

Plaintiff's claims relate to alleged breaches of fiduciary duties as well as prohibited transactions.  Acting as a fiduciary is a requirement for both claims, as is breaching a legal duty.[4] 29 U.S.C. §§ 1104(a), 1106(b); *see also Braden*, 588 F.3d at 594 (explaining that to state a claim under § 1104, "a plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan").  A person is a fiduciary to a plan if the plan identifies the person as such.  29 U.S.C. § 1102(a).  In addition, ERISA provides:

> [A] person is a fiduciary with respect to a plan to the extent
>
> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

_____

[4] With respect to the allegations of the Breach of the Duty of Loyalty and the Breach of the Duty of Prudence, the relevant statutory provisions state:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a)(1)(A), (B).  With respect to the allegation of Prohibited Transactions: "A fiduciary with respect to a plan shall not—(1) deal with the assets of the plan in his own interest or for his own account[.]"  *Id.* § 1106(b)(1).  Additionally, "a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties shall be personally liable to make good" any resulting losses and to restore to such plan any profits.  *Id.* § 1109.

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.* § 1002(21)(A). The Eighth Circuit has noted the "clear difference" between subsections one and three. *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 (8th Cir. 1992). "Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted." *Id.* In contrast, "[s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised." *Id.* Later, the Eighth Circuit somewhat incongruously observed subsection one "imposes fiduciary duties only if one exercises *discretionary* authority or control over plan *management*, but imposes those duties *whenever* one deals with plan *assets*." *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir. 1994) (inferring the "distinction is not accidental") (emphasis in original); *see also Leimkuehler*, 713 F.3d at 913 (collecting cases of circuit courts observing this and embracing view that "insofar as 'management or disposition of assets' is concerned, there is no separate requirement of discretionary authority or control"). In addition, subsection one's reach "is limited to circumstances where the individual actually exercises some authority." *Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 733 (8th Cir. 2008).

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226; *accord Bjorkedal*, 516 F.3d at 732; *see also Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)

(addressing the "threshold issue of whether the defendants were acting in a fiduciary . . . capacity when the acts in question took place").  The Eighth Circuit has advised that "[t]he term fiduciary is to be broadly construed."  *Olson*, 957 F.2d at 625 (internal citation and quotation marks omitted).  Even so, because of the phrasing of 29 § 1002(21)(A), "one who is an ERISA fiduciary only by reason of § 1002(21)(A) is liable only 'to the extent' he exercises discretionary control, renders investment advice, or has discretionary administration responsibility."  *Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir. 1992).  Consequently, one may be an ERISA fiduciary for some purposes but not for others.  *Kerns v. Benefit Trust Life Ins. Co.*, 992 F.2d 214, 217 (8th Cir. 1993).  As these manifold insights demonstrate, ERISA fiduciary cases are "inevitably fact intensive."  *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

Plaintiff alleges Defendant is a fiduciary in at least three respects.  [Compl. ¶ 53].  First, Defendant admits it is an investment advisor with respect to Plan assets, [Accumulation Group Annuity Endorsement Rider at 6; Compl. ¶ 16], and hence is a fiduciary with respect to the Plan and assets under 29 U.S.C. § 1002(21)(A)(ii).  [Compl. ¶ 54].  Second, Plaintiff alleges Defendant unilaterally sets the Management Fee and Operating Expenses, has discretion to choose which separate accounts are offered to the Plan, and has discretion to add separate accounts.  *Id.* ¶ 55.  Accordingly, Plaintiff alleges, Defendant is a fiduciary under 29 U.S.C. § 1002(21)(A)(i).  *Id.* Finally, Plaintiff alleges Defendant's authority to decide which separate accounts are offered and how much it will charge makes it a fiduciary under 29 U.S.C. § 1002(21)(A)(iii).  *Id.* ¶ 56.

Defendant makes two arguments in support of its Motion to Dismiss.  First, Defendant argues it cannot be held liable for assessing fees that Plaintiff itself authorized.  [Def.'s Br. at 3].  Second,

Defendant argues Plaintiff has failed to plead Defendant is an ERISA fiduciary in any relevant respect. *Id.* at 6.

### 1. Assessment of Fees Plaintiff Allegedly Authorized

Defendant contends "a service provider neither acts as a fiduciary nor breaches any duty when it charges fees that are approved by a plan fiduciary—here, Plaintiff." *Id.* at 3. Defendant argues that it merely charged fees authorized by Plaintiff; therefore, Defendant is not a fiduciary. *See id.* at 6 (reasoning that because Plaintiff decided to accept Defendant's fees and services, Plaintiff cannot claim Defendant violated any duty by charging those fees). Defendant maintains the only way Plaintiff can state a claim under ERISA is by pleading that Defendant controlled Plaintiff's decision to engage Defendant and enter into a contract that authorized the fees. *Id.* at 5. Because Plaintiff's Complaint does not allege Defendant had any such control, Defendant insists, the Complaint should be dismissed. *Id.* at 4.

Plaintiff appears to make four arguments in response. First, Plaintiff notes that negotiations between plan sponsors and potential ERISA fiduciaries are not truly at arm's length. [Pl.'s Br. at 14 & n.11]. Second, even if the Group Annuity Contract was negotiated at arm's length, Plaintiff argues subsequent performance under the contract is subject to ERISA's demanding fiduciary duties. *Id.* at 14. Third, Plaintiff appears to contend it did not agree to these fees anyway: "Here, it is the excessive *total* fees and charges that Principal actually imposed month after month once the contract was executed that McCaffree challenges, not the theoretical maximum management fee purportedly negotiated in the contract." *Id.* at 14–15; *see also id.* at 14 n.9 ("McCaffree claims that the *total* fees and expenses charged by Principal are excessive, without regard to whether Principal characterizes a particular charge as a 'management fee' or an 'operating expense.'"). At oral argument, Plaintiff

-13-

raised a fourth argument.  Plaintiff contends Defendant cannot by contract excuse itself from fiduciary liability.  [*See, e.g.*, Tr. at 30–34, 38–40 (discussing ERISA's exculpatory-provision prohibition and a recent decision of the Supreme Court)].

### a.  Guidance from other circuits

Neither the parties nor this Court unearthed any controlling Eighth Circuit authority.  To establish that a service provider does not act as fiduciary when it charges fees approved by a plan fiduciary, Defendant relies primarily on four recent cases from other circuits.  In *Chicago District Council of Carpenters Welfare Fund v. Caremark, Inc.*, the plaintiff, Carpenters, provided labor union members with healthcare benefits, which included prescription drug coverage. 474 F.3d 463, 466 (7th Cir. 2007).  Carpenters hired the defendant, Caremark, to manage the prescription benefit under a series of contracts signed in 1996, 1999, and 2003.  *Id.*  Each contract contained a similar paragraph setting out the costs of retail pharmacy services.  *Id.* at 467.  The 2003 contract, for instance, provided:

> For each Prescription billed to [Carpenters] . . . [Carpenters] shall pay Caremark: (i) for Brand Drugs, the lower of Usual and Customary Price or AWP less 15%, or (ii) for Generic Drugs AWP less 55%; plus in each case a dispensing fee of $2.05 for Brand Drugs and $2.20 for Generic Drugs . . . .

*Id.* at 467–68.[5]  Carpenters alleged Caremark breached its fiduciary duties by charging Carpenters a higher drug price than Caremark negotiated with retail pharmacies, which allowed Caremark to

---

[5] "Usual and Customary Price" and "AWP" were terms defined in the contracts.  *Caremark*, 474 F.3d at 468.  "AWP" referred "to the average wholesale price for a prescription drug as reported in First Data Bank or other nationally available reporting service of pharmaceutical prices."  *Id.*  "Usual and Customary Price" referred "to the retail price charged by a participating pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported by the participating pharmacy to Caremark."  *Id.*

impermissibly retain the cost savings. *See id.* at 470 (noting Carpenters' allegations and explaining the district court had found nothing in the contracts that "required Caremark to pass through cost savings to Carpenters").

Carpenters argued Caremark was a fiduciary because Caremark had discretionary authority or control "to negotiate up-front and adjust on an ongoing basis the price Carpenters pays for drugs that union members obtain from retail pharmacies." *Id.* at 472. The United States Court of Appeals for the Seventh Circuit rejected this argument, gleaning from its "thorough review" of the contracts that "Carpenters agreed to pay set prices for the drugs, prices negotiated with Caremark at arm's length." *Id.* The price Carpenters agreed to pay "was tied to a number fixed by" a national price index, a pharmacy's retail price for a particular drug, or, in the case of some contracts, a price schedule used by Medicare and Medicaid. *Id.* Caremark could not negotiate the drug prices set by any of the three sources. *See, e.g.*, *id.* ("There was no way for Caremark to 'negotiate' the AWP reported on a national index."). In each of the three contracts, Carpenters agreed to pay prices based on "fixed numbers" and to pay "a fixed dispensing fee" for each prescription. *Id.* at 472–73. The Seventh Circuit, as well as the district court before it, recognized that "nothing in any of the contracts required Caremark to pass through any additional cost savings it managed to negotiate with retailers." *Id.* at 473.

The court also rejected Carpenters' argument that another contract provision required Caremark to negotiate with retailers the rates that it "would pay on behalf of the plan, costs that were then reimbursed by Carpenters." *Id.* The court found the argument made "little sense" because Carpenters negotiated to pay Caremark fixed drug prices "based on indexes largely outside the control of either party to the contract." *Id.* The percentage discounts and the dispensing fees, the

amounts within the parties' control, were negotiated between Carpenters and Caremark at arm's length. *Id.* The contracts, however, "contained no mechanism for a pass-through of any additional savings Caremark managed to negotiate with retailers." *Id.* The contracts thus freed Caremark to negotiate with retailers to pay less than Carpenters would reimburse it, "allowing Caremark to pocket the difference." *Id.* Because "this scheme was the very deal for which Carpenters bargained at arms' length, Caremark owed no fiduciary duty in this regard." *Id.* (citing *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1131–32 (7th Cir. 1983)). The Seventh Circuit therefore affirmed the district court's Rule 12(b)(6) dismissal. *Id.* at 475.

Defendant next cites another Seventh Circuit case, *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009). In *Hecker*, the plaintiffs alleged their employer, Deere & Company ("Deere"), and Fidelity Management Trust Company ("Fidelity Trust") and Fidelity Management & Research Company ("Fidelity Research"), service providers for the two available 401(k) plans, had breached their fiduciary duties. *Id.* at 578–79. The two 401(k) plan options available to participants included 23 different Fidelity mutual funds, two investment funds managed by Fidelity Trust, and access to 2,500 additional funds. *Id.* at 578. Fidelity Research advised the Fidelity mutual funds. *Id.* Plan participants decided where to invest their 401(k) funds, subject only to the limitation "that the investment vehicle had to be one offered by the Plan." *Id.* Deere and Fidelity Trust agreed, however, to limit the selections available to Deere employees to Fidelity funds, with some minor exceptions. *Id.* at 579. Each fund charged a fee, which was a percentage of the assets the participant invested. *Id.* at 578. Plaintiffs alleged Fidelity Research shared revenue it earned from mutual fund fees with Fidelity Trust. *Id.* In turn, Fidelity Trust compensated itself through the shared revenue, instead of charging Deere for Fidelity Trust's services. *Id.* The plaintiffs filed suit, alleging, among

other things, that Fidelity Research's revenue-sharing program caused them to pay unreasonable and excessive fees and expenses. *Id.* at 579. The Seventh Circuit addressed the threshold question whether Fidelity Trust and Fidelity Research were fiduciaries under ERISA. *Id.* at 583. The plaintiffs argued Fidelity Trust exercised the necessary control to confer upon it fiduciary status by "limiting Deere's selection of funds through the Trust Agreement to those managed by Fidelity Research." *Id.* "But what if it did?" queried the court. *Id.* The plaintiffs cited no authority holding that limiting funds to a sister company creates discretionary control for fiduciary status. *Id.* "To the contrary . . . there are cases holding that a service provider does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms." *Id.* (citing *Caremark*, 474 F.3d at 463; *Schulist*, 717 F.2d at 1127). Under this rule, the Seventh Circuit affirmed the district court's Rule 12(b)(6) dismissal. *See id.* at 584 (affirming).

Defendant relies next on *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011). There, the plaintiffs brought suit against their employer, Unisys Corp., which offered its employees a 401(k) plan, and Fidelity, the plan's directed trustee. *Id.* at 318. The plan investment options included mutual funds, some of which were managed by Fidelity. *Id.* at 318–19. Each mutual fund incurred investment management fees expressed as an expense ratio, which is "a percentage of each contributor's assets invested in a particular fund." *Id.* at 319. Expense ratios on the mutual funds, which paid for investment management and compliance costs, ranged from 0.1% to 1.21%. *Id.* "All fees were disclosed in materials distributed to the participants." *Id.*

The plaintiffs alleged the administrative fees and mutual fund fees were "excessive in light of the services rendered as compared to other, less expensive, investment options not included in

the plan." *Id.*  According to the plaintiffs, Unisys could have chosen investments with lower fees than mutual funds or used leverage to bargain for lower fee rates.  *Id.*

The parties disputed whether Fidelity was a fiduciary "with respect to the challenged conduct of selecting and retaining investment options in the Unisys plan." *Id.* at 322.  The plaintiffs asserted three theories under which they contended Fidelity was a fiduciary.  *Id.* at 322–23.  One theory alleged Fidelity was liable as a co-fiduciary for any breach by Unisys.  *Id.* at 323–24.

The co-fiduciary theory implicated a specific co-fiduciary statute under ERISA; however, the United States Court of Appeals for the Third Circuit analyzed whether Fidelity could be liable as a co-fiduciary according to standards set forth in ordinary fiduciary cases.  *See id.* at 324 (citing *Hecker*, 556 F.3d at 583; *Caremark*, 474 F.3d at 473).  Echoing the Seventh Circuit, the Third Circuit first observed "a party 'does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms.'" *Id.* (quoting *Hecker*, 556 F.3d at 583); *see also Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 293 (3d Cir. 2014) ("[A] service provider owes no fiduciary duty to a plan with respect to the terms of its service agreement if the plan trustee exercised final authority in deciding whether to accept or reject those terms.").  The court next quoted a decision of the United States Court of Appeals for the Second Circuit:

> "When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him. Such a person is not an ERISA fiduciary with respect to the terms of the agreement for his compensation."

*Renfro*, 671 F.3d at 324 (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)).   Under these authorities, the Third Circuit found Fidelity owed no fiduciary duty with respect to its fees because "Fidelity was not yet a plan fiduciary at the time it negotiated the fee compensation with Unisys." *Id.*   Therefore, the court upheld the Rule 12(b)(6) dismissal. *Id.* at 325.

Finally, Defendant cites *Leimkuehler*, 713 F.3d at 905.   There, Leimkuehler, Inc. ("Leimkuehler") hired an insurance company, American United Life Insurance Company ("AUL"), to service a 401(k) plan for Leimkuehler's employees. *Id.* at 908.   Under one service AUL provided, plan participants could invest in mutual funds using a separate account. *Id.*   Using separate accounts "simplifie[d] matters" for mutual funds, thus substantially reducing "the mutual funds' administrative, marketing, and service costs." *Id.* at 908–09.   Costs did not vanish, though, meaning AUL was required to "perform many of the services that the mutual funds would otherwise handle themselves." *Id.* at 909.   AUL covered the costs of providing these services to plan participants by using revenue sharing, a system under which "mutual fund companies pay a portion of the fees they charge investors—fees that are referred to as a fund's 'expense ratio' and that are expressed as a percentage of a fund's assets—to AUL." *Id.*   Additionally, within a single mutual fund there were different "share classes," which "var[ied] primarily (and possibly exclusively) in terms of expense ratio and revenue sharing (if any)." *Id.*   In general, "the higher a given share class's expense ratio, the more the fund pa[id] AUL in revenue sharing." *Id.*   Also, in general, the more AUL received in revenue sharing, the less it charged participants directly. *Id.*

Plan participants could not invest in any mutual fund available in the market; rather, the range of mutual funds was narrowed at two stages. *Id.*   at 909–10.   First, AUL selected a menu of fund options and presented the menu to the plan's trustee. *Id.* at 910.   For each fund, "AUL also

selected a particular share class, and thus a particular expense ratio and level of revenue sharing." *Id.* All parties agreed that AUL disclosed to the trustee each fund's expense ratio, so the trustee "knew how much each mutual fund cost." *Id.* At the second stage, the trustee selected the specific funds to make available to plan participants from AUL's menu. *Id.*

The plaintiff filed suit against AUL, alleging AUL's revenue-sharing practices breached a fiduciary duty. *Id.* The plaintiff argued AUL was a fiduciary because it exercised discretion or control over the management of plan assets by selecting which mutual fund share classes to include on its investment menu. *Id.* Under this theory, which the Seventh Circuit "broadly . . . termed a 'product design' theory," the plaintiff asserted that, in making decisions about which mutual funds to include and which share classes to select, AUL was "setting the stage for any revenue sharing in which it wishe[d] to engage." *Id.* at 911. Thus, the plaintiff contended, the product design "shape[d] the disposition of Plan assets," and so made AUL a fiduciary. *Id.*

The Seventh Circuit found the plaintiff's theory "functionally indistinguishable from the one . . . rejected in *Hecker*." *Id.* After noting relevant similarities and minor factual differences between *Hecker* and the case before it, finding nothing that meaningfully differentiated the two, the court acknowledged the ability of the plaintiff to select a less expensive plan had it seen fit: "[G]iven that AUL does disclose the bottomline cost of every fund that it offers, Leimkuehler was free to seek a better deal with a different 401(k) service provider if he felt that AUL's investment options were too expensive." *Id.* at 911–12. "In short," the court concluded, "we see no basis for distinguishing AUL's actions here from those in *Hecker*." *Id.* at 912.

b. Disclosure of the fees in this case

Defendant argues under these authorities it is not a fiduciary with respect to the terms in its agreement with Plaintiff.  [Def.'s Br. at 3].  As both the Seventh and the Third Circuits have held, a service provider is not a fiduciary at the time a plan agreement is negotiated and entered into. *Santomenno*, 768 F.3d at 295 ("Nothing prevented the trustees from rejecting John Hancock's product and selecting another service provider; the choice was theirs."); *Leimkuehler*, 713 F.3d at 911–12 (applying *Hecker* and concluding a service provider was not a fiduciary when deciding which mutual funds to include in a plan); *Renfro*, 671 F.3d at 324 (holding a service provider "was not yet a plan fiduciary at the time it negotiated the fee compensation" under an agreement); *Hecker*, 556 F.3d at 583 (holding service provider was not a fiduciary "with respect to the terms in the service agreement").  The Third Circuit has explained this reasoning makes sense because when a plan is negotiated, the plan sponsor, not the service provider, decides whether to accept the service provider's terms.  *Santomenno*, 768 F.3d at 293.  On the other hand, both courts recognize a service provider could be a fiduciary by controlling the named fiduciary's negotiation and approval of a service agreement's terms.  *Renfro*, 671 F.3d at 324; *Hecker*, 556 F.3d at 583.  Here, however, as Defendant notes, Plaintiff does not allege Defendant controlled its decision to accept the terms of any agreement.  [Def.'s Br. at 4]. Thus, Defendant asserts, it cannot be a fiduciary with respect to terms in the agreement.  *Id.* at 6.

The case before the Court is in one salient way distinguishable from the circuit court cases Defendant relies upon.  In *Liemkuehler*, *Renfro*, and *Caremark*, the fees or costs to plan participants were disclosed in plan documents.  *See Leimkuehler*, 713 F.3d at 910 ("[A]ll parties agree that AUL did disclose each fund's expense ratio."); *Renfro*, 671 F.3d at 319 ("All fees were disclosed in

materials distributed to the participants."); *Caremark*, 474 F.3d at 467–68 (setting forth the language of the contracts at issue).   There is dispute regarding the clarity of disclosure in this case.

The Separate Investment Account Rider contains fee and expense disclosures.  [*See* Separate Investment Account Rider at 18, 19, 27–31].  It discloses three fees or expenses.  *Id.*  Although the Separate Investment Account Rider defines Operating Expenses, *see id.* at 18; [Compl. ¶ 21], it does not specify the amount of the Operating Expense on each separate account.  Nor does it indicate, Plaintiff notes, "precisely how these expenses are calculated."  [Pl.'s Br. at 14].  The Management Fee, too, is defined.  [Separate Investment Account Rider at 18, 19].  But unlike with the Operating Expenses, the Separate Investment Account Rider discloses the amount of the Management Fee for each separate account, which is limited by a 3% cap for nearly every separate account.  *Id.* at 27–31.  Finally, the Separate Investment Account Rider discloses that the Management Fee "does not include Management Fees of any underlying Mutual Funds."  *Id.* at 27–31 nn.2–3.  It does not, however, specify the amount of the underlying mutual fund fee.  Instead, it suggests seeing the "appropriate prospectuses" for the underlying mutual funds' fees.  *Id.*

Plaintiff does not contend it was unaware of these fees; rather, Plaintiff contends it was unaware the total fees charged on each separate account would be different than the fees and expenses disclosed in the Separate Investment Account Rider.  [Pl.'s Br. at 14 n.9, 14–15; Tr. at 35].  Plaintiff contended at oral argument that the totality of the fees was never explained.  [Tr. at 35–36].  Plaintiff alleges, for instance, that for one separate account, denominated "Principal SmallCap Growth I Separate Account," Defendant charges an extra fee of 1.73% "simply for wrapping its Separate Accounts around its own mutual funds."  [Compl. ¶ 31 & Table I; *see also* Pl.'s Br. at 15].  Plaintiff alleges this fee is combined with the fee of a corresponding mutual fund to result in a "Total

Effective Fee" of 2.81% on the separate account.  [Compl. ¶ 33 & Table II; Pl.'s Br. at 15].  In

contrast, the Management Fee on the Principal SmallCap Growth I Separate Account, as disclosed

in the Separate Investment Account Rider, is 1.51%.  [Separate Investment Account Rider at 29;

Pl.'s Br. at 15].[6]  By agreeing to a maximum Management Fee of 3%, Plaintiff insists, it did not

grant Defendant "carte blanche to charge grossly excessive fees."  [Pl.'s Br. at 15].

Plaintiff's argument does not justify departing from the Third and Seventh Circuits' holdings

in *Liemkuehler*, *Renfro*, *Hecker*, and *Caremark*.  The Separate Investment Account Rider discloses

three fees or expenses: a Management Fee, an Operating Expense, and an underlying mutual fund

fee.  It specifically discloses the Management Fee on each separate account at the time the

agreement between the parties was entered into, subject to a 3% maximum.  [Separate Investment

Account Rider at 27–31].  The Separate Investment Account Rider discloses that the listed

Management Fee does not include the fee of any underlying mutual fund.  *See id.* at 27–31 nn.2–3.

Put differently, the Separate Investment Account Rider discloses that each separate account could

be subject to a Management Fee of up to 3% plus another fee on the underlying mutual fund.  And

the Separate Investment Account Rider discloses that, on top of the other two fees, each separate

---

[6] The Court notes what appears to be an error.  Plaintiff asserts "the supposed management fee for the SmallCap Growth I fund is 2.26 percent while the actual effective fee is 2.81 percent." [Pl.'s Br. at 15].  The Separate Investment Account Rider, however, lists the Management Fee for the Principal SmallCap Growth I Separate Account as 1.51%.  [Separate Investment Account Rider at 29].  The fee of the account listed immediately above the Principal SmallCap Growth I Separate Account, denominated "Principal SmallCap Growth Separate Account," is 2.26%.  Assuming the "Total Effective Fee" of 2.81% would remain the same regardless of which Management Fee were used to calculate it, the difference in the "Total Effective Fee" and the Management Fee is clearly larger if the Management Fee is 1.51% rather than 2.26%.  Because Plaintiff claims it did not agree to the "grossly excessive fees," the Court assumes for the purpose of this motion that Plaintiff intended to emphasize the larger difference, i.e., the difference between the "Total Effective Fee" of 2.81% and the Management Fee of 1.51%.

account is assessed an Operating Expense charge "which must be paid in order to operate a Separate Account." *Id.* at 18. Thus, all three fees or expenses alleged to constitute the excessive fees were disclosed in the Separate Investment Account Rider. That the sum of these three fees or expenses may result in costs, even significant costs, to Plan participants is fully disclosed in the Separate Investment Account Rider.[7]

Moreover, Plaintiff cites no authority supporting the proposition that to avoid being deemed a fiduciary, a service provider must go beyond disclosing its fees and explain with precision how those fees are calculated. Neither the Seventh nor the Third Circuit cases cited by Defendant support this proposition. At any rate, the Separate Investment Account Rider discloses sufficient fee and expense information to enable Plaintiff to determine with rough accuracy the cost of each separate account, a figure that could be computed by adding the specifically disclosed separate account's Management Fee to the fee of the publicly available underlying mutual fund.[8] Defendant's disclosure of the fees and expenses left Plaintiff, in the words of the Seventh Circuit, "free to seek a better deal with a different 401(k) service provider." *Leimkuehler*, 713 F.3d at 912;

---

[7] The Court notes there is no evidence, nor any allegation, that Defendant ever charged Plaintiff more than these negotiated amounts.

[8] Plaintiff does not allege the underlying mutual fund fees were not available in the mutual funds' prospectuses. At oral argument, Defendant contended the amount of the mutual fund fees is publicly available information. [Tr. at 10]. One district court has noted in a similar case that "prospectuses filed with the Securities and Exchange Commission (SEC) indicate such fees." *Renfro v. Unisys Corp.*, No. 07-2098, 2010 WL 1688540, at *2 n.2 (E.D. Pa. April 26, 2010) (unpublished), *aff'd*, 671 F.3d 314 (3d Cir. 2011). Even assuming the fees of the underlying mutual funds were not publicly available, the existence of such underlying fees was disclosed in the Separate Investment Account Rider. Plaintiff therefore had sufficient information from which to conclude fees and expenses would be added onto the specifically disclosed Management Fee. Based on this information, Plaintiff could have sought a different arrangement with a different service provider. *Leimkuehler*, 713 F.3d at 912.

*see also Santomenno*, 768 F.3d at 295 ("Nothing prevented the trustees from rejecting John Hancock's product and selecting another service provider; the choice was theirs."); *Caremark*, 474 F.3d at 473 (finding that "this scheme was the very deal for which Carpenters bargained at arms' length," and so "Caremark owed no fiduciary duty in this regard").

### c.  Arm's length bargaining

Plaintiff argues negotiations between plan sponsors and service providers are not truly at arm's length.  [Pl.'s Br. at 14 & n.11]; *see Caremark*, 474 F.3d at 473 (holding service provider owed no fiduciary duty because arm's length bargaining produced the governing contract).  In support, Plaintiff relies on a case in which the court rejected a service provider's assertion it had no control over fees because the fees were the product of arm's length negotiations.  *Santomenno v. Transamerica Life Ins. Co.*, No. CV. 12–02782 DDP (MANx), 2013 WL 603901, at *6–7 (C.D. Cal. Feb. 19, 2013) (unpublished).  There, the court found traditional arm's length bargaining was characterized by adversarial parties pursuing independent interests.  *Id.* at *6.  By contrast, in the ERISA context, parties collaborate to manage employees' retirement plans.  *Id.* at *7.  The court thus concluded the ERISA-governed contract at issue had not been negotiated at arm's length, and so the service provider could "not shield itself behind the contract from an alleged breach of duty." *Id.*

This argument is unpersuasive.  First, Plaintiff does not allege the Group Annuity Contract was not negotiated at arm's length.  Even putting that aside, the central premise of the cases relied on by Defendant was not that the contract was produced by arm's length bargaining, but rather that the plan sponsor was able, because the contract terms had been disclosed, to seek a contract with another service provider.  To be sure, *Caremark* mentions arm's length bargaining, 474 F.3d at 473,

but *Leimkuehler*, *Renfro*, and *Hecker*, all of which followed *Caremark*, do not.  Regardless whether the parties engage in arm's length bargaining in some traditional sense, a service provider, according to these cases, ordinarily has no control over a plan sponsor's decision to enter into a contract.  *See, e.g.*, *Renfro*, 671 F.3d at 324 (observing a person with no relationship to an ERISA plan has no authority over or even responsibility to the plan and thus cannot exercise control over the decision whether to enter into an agreement).  It follows from a service provider's lack of control that a plan sponsor remains free to seek out another, perhaps less expensive, provider.  In these circumstances, these courts hold a service provider is not a fiduciary.  *See id.* (concluding service provider had not become a fiduciary at the time it negotiated contractual fee compensation).  The Court is confident these courts would similarly hold Defendant is not a fiduciary and finds reliance on these authorities is appropriate.  Therefore, accepting all allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court concludes under these authorities Defendant is not a fiduciary with respect to the fee and expense terms in the Group Annuity Contract.

### d. Subsequent performance

Even assuming the Group Annuity Contract was the product of arm's length bargaining, Plaintiff continues, "subsequent performance under that contract is subject to ERISA's demanding fiduciary duties." [Pl.'s Br. at 14].  In support, Plaintiff cites *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.*, 805 F.2d 732 (7th Cir. 1986).  There, the plaintiffs alleged an insurance policy gave the defendants a unilateral right to reduce the rate of return on a policy to a certain minimum and increase the premium rates to a certain maximum.  *Id.* at 734.  The plaintiffs also alleged the defendants had exercised their authority to do so.  *Id.*  The defendants, relying on an earlier Seventh Circuit case, *Schulist*, argued they were not fiduciaries.  *Id.* at 737.

-26-

The court discussed its reasoning in *Schulist*. *Id.* In that case, the Seventh Circuit observed, it had held an insurance provider was not a fiduciary because it exercised no discretionary authority in setting rates. *Id.* Instead, the insurer "had entered into an 'arm's length bargain presumably governed by competition in the marketplace' that specified the premium rate." *Id.* (quoting *Schulist*, 717 F.2d at 1132). In *Ed Miniat*, the court rejected the defendants' argument they were not fiduciaries under *Schulist*. *Id.* The Seventh Circuit explained,

> The defendants in effect argue that no action by an insurer can subject it to fiduciary liability so long as discretion to take the action was granted to it by contract and the contract was entered into at arm's length. This reading of *Schulist* is incorrect. *Schulist* stands for the proposition that if a specific term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty. No discretion is exercised when an insurer merely adheres to a specific contract term. When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.

*Id.* Having clarified *Schulist*'s holding, the court concluded the defendants had discretionary power to amend the contract and had exercised the power to do so. *Id.* at 738.

At least two circuit courts have since adopted this reasoning. The United States Court of Appeals for the Sixth Circuit has held a service provider adhering to a contract term is not a fiduciary but it may be a fiduciary if a contract authorizes it to exercise discretion. *See Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003) (adopting the reasoning of *Ed Miniat*). The United States Court of Appeals for the Second Circuit also has held a service provider may be a fiduciary if a contract authorizes it to exercise discretion with respect to a contractual right. *See Harris Trust*, 302 F.3d at 29 (embracing *Ed Miniat*'s reasoning "that where parties negotiate the terms of a contract . . . , the adherence to those terms . . . cannot constitute a breach of . . .

fiduciary duties, barring a grant of discretionary authority to the fiduciary"); *accord F.H. Krear*, 810 F.2d at 1259.  On the other hand, the Second Circuit held, a service provider is not a fiduciary if it is merely adhering to the contract's terms.  *See Harris Trust*, 302 F.3d at 29 (concluding a service provider lacked discretionary contractual authority to permit withdrawal of plan funds).  Applying this rule, the court in *Harris Trust* held a service provider was not a fiduciary with respect to an agreement's non-discretionary terms on compensation.  *Id.* at 31.

At least two district courts outside this circuit have also applied this reasoning, and Plaintiff likens this case to four cases decided by those courts.  Plaintiff cites *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State St. Bank & Trust Co.*, 931 F. Supp. 2d 296 (D. Mass. 2013).  There, the Massachusetts court denied summary judgment because it found the service contracts gave the service provider "significant discretionary authority to determine the amount of its . . . compensation."  *Id.* at 304.  In another case Plaintiff cites, *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008), the Massachusetts court denied summary judgment, finding the service provider was a fiduciary because the contract gave the service provider "discretionary authority over its fees."  *Id.* at 197.  Specifically, the contract gave the service provider authority to set an "administrative maintenance charge," subject only to a maximum charge.  *Id.*  Also, the contract did not disclose how the maintenance charge was calculated.  *Id.*

Plaintiff next cites *Transamerica*, 2013 WL 603901, at *1.  There the plaintiffs alleged they were charged excessive fees because they were charged a separate account fee on top of a mutual fund fee.  *Id.* at *3.  The service provider argued it was not a fiduciary because it lacked final authority to enter into the contract on behalf of the plan.  *Id.* at *5.  The California court rejected the

service provider's argument as "formalistic line-drawing" that would allow "fiduciaries to contract themselves out of their duties." *Id.* at *6.  Finally, plaintiff cites *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, __ F. Supp. 2d __, 2014 WL 2117511 (D. Mass. May 20, 2014).  In that case, the Massachusetts court denied summary judgment, concluding a jury could find a service provider was a fiduciary because the service provider "had the discretion to unilaterally set fees up to a maximum and exercised that discretion." *Id.* at __, *7.

Defendant criticizes *Transamerica* as "wrongly decided." [Def.'s Br. at 5].  In assailing the case, Defendant alludes to the mutual inconsistency of the rule it advocates, on the one hand, and the rule applied in *Transamerica*, which Plaintiff advocates, on the other hand.  *See id.*  That is, Defendant advocates a rule holding "a service provider does not act as a fiduciary with respect to the terms in the service agreement."  *Hecker*, 556 F.3d at 583.  This rule, applied by both the Seventh and Third Circuits, conflicts with *Transamerica*'s conclusion that a service provider could be a fiduciary if the service agreement grants the service provider discretion. *Compare Hecker*, 556 F.3d at 583, *with Transamerica*, 2013 WL 603901, at *7 ("'When a contract . . . grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.'" (quoting *Ed Miniat*, 805 F.2d at 737)).  As Defendant argues, "When a service provider bids for business, the only party acting as a fiduciary is the plan administrator." [Def.'s Br. at 5].  Indeed, for this reason the Third Circuit rebuffed *Transamerica* as "flatly inconsistent with our controlling decision in *Renfro*, which cited *Hecker* with approval for the proposition that there is no fiduciary duty with regard to contract negotiations." *Santomenno*, 768 F.3d at 295 n.6.  This reasoning applies with equal force to the other three district court cases on which Plaintiff relies.  Simply put, a service provider that was not a fiduciary when a contract was

made does not become one because of a contract's terms.  Consequently, having found Defendant was not a fiduciary with respect to the fee and expense terms in the contract, the Court need not apply this competing, alternative reasoning.

Assuming the Court were to apply this reasoning, the Court finds controlling Eight Circuit law prevents it from concluding Defendant is a fiduciary.  The Eighth Circuit holds that because 29 U.S.C. § 1002(21)(A)(i) "imposes a fiduciary duty on those not named as a fiduciary, its reach is limited to circumstances where the individual actually exercises some authority." *Bjorkedal*, 516 F.3d at 733; *see also* 29 U.S.C. § 1002(21)(A)(i) ("[A] person is a fiduciary with respect to a plan to the extent (i) he exercises . . . ."). Thus, to be a fiduciary under Eighth Circuit law, Defendant must have exercised some authority.

Consistent with Eighth Circuit law, the cases Plaintiff cites also depended on an exercise of contractually granted discretion.  Consider *Ed Miniat*.  There, as noted above, the Seventh Circuit found the defendants had contractual discretion and exercised their contractual discretion.  *See* 805 F.2d at 738 (noting the "power to amend the contract" and the "power exercised by" the defendants). The same is true of two of the lower court decisions, *Glass Dimensions* and *Golden Star*. In *Glass Dimensions*, the service provider not only had discretion, but also exercised discretion.  931 F. Supp. 2d at 302 (noting allegation that service provider "set" its fee at 50%).  In *Golden Star* the service provider exercised its contractual discretion.  __ F. Supp. 2d at __, 2014 WL 2117511, at*7 (finding service provider was a fiduciary because it had "discretion to unilaterally set fees up to a maximum and exercised that discretion").  In this case, by contrast, Defendant exercised no contractually granted discretion.  Defendant had the contractual discretion to raise Management Fees up to 3%, but Plaintiff does not allege Defendant exercised its discretion to do so.  [*See, e.g.*, Def.'s

Reply at 3 (noting that Defendant did not exercise authority to change fees and that Plaintiff does not allege it did)].   Plaintiff likewise does not allege that, subsequent to entering the contract, Defendant exercised its contractual discretion to limit which separate accounts would be available to Plan participants. [*See* Separate Investment Account Rider at 1].   Accepting all allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court finds no support for the conclusion Defendant exercised any contractual discretion.   Under the alternative reasoning urged by the Plaintiff, the Court concludes Defendant is not a fiduciary.   *Bjorkedal*, 516 F.3d at 733.

### e.  Contractual excusal

Finally, Plaintiff argues Defendant cannot by contract excuse itself from fiduciary liability. [Tr. at 38–40].  In support, Plaintiff first cites an ERISA statute prohibiting exculpatory provisions in plan agreements or instruments.  With some exceptions irrelevant here, the statute states, "[A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty . . . shall be void as against public policy."  29 U.S.C. § 1110(a); *see also Traveler Cas. & Sur. Co. of Am. v. IADA Servs., Inc.*, 497 F.3d 862, 866 (8th Cir. 2007) (noting this provision "voids any agreement that purports to limit a fiduciary's responsibility or liability").  Plaintiff next cites a recent decision of the Supreme Court, *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459 (2014).  There, the Supreme Court rejected an employer's argument that plan documents waived the fiduciary duty of prudence to the extent the duty conflicted with the plan documents' command to invest in employer stock.  *Id.* at __, 134 S. Ct. at 2469.  The Supreme Court reasoned that although this waiver might be acceptable under common law, "trust documents cannot excuse trustees from their duties under ERISA."  *Id.* (citation and internal quotation marks omitted).

Plaintiff does not identify a specific provision of the agreement that purports to relieve Defendant of its fiduciary obligations.  Plaintiff seems to argue, rather, that even if Defendant and Plaintiff agreed by contract to the fee terms, Defendant cannot rely on its compliance with those contract terms to avoid liability.  [Tr. at 39–40]; *see, e.g.*, *IT Corp. v. Gen. Am. Life. Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997) ("If an ERISA fiduciary writes words in an instrument exonerating itself of fiduciary responsibility, the words, even if agreed upon, are generally without effect.").  In other words, Plaintiff insists, there is no voluntary payment doctrine under ERISA.  [*See* Tr. at 39–40]; *cf. Best Buy Stores, L.P. v. Benderson-Wainberg Assocs., L.P.*, 668 F.3d 1019, 1030 (8th Cir. 2012) ("The voluntary payment doctrine is a long-standing doctrine of law, which clearly provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment." (citation and internal quotation marks omitted)).

At least three flaws hobble Plaintiff's argument.  First, Plaintiff cites no authority supporting its novel interpretation of § 1110(a), and the argument finds no support in case law of the Eighth Circuit.  The Eighth Circuit has twice considered arguments made under this provision and twice indicated the provision is narrow and limited to its plain terms.  *See Leavitt v. Nw. Bell Tel. Co.*, 921 F.2d 160, 161–62 (8th Cir. 1990) (holding § 1110(a) does not prohibit a release of claims); *Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc.*, 847 F.2d 475, 478 (8th Cir. 1988) (holding on "[a] plain reading of the text of the statute" that § 1110(a) does not prohibit agreements to arbitrate ERISA claims); *cf. IT Corp.*, 107 F.3d at 1418–19 (voiding a contractual provision that stated "under no circumstances shall the service contractor . . . be considered the named fiduciary under the Plan").  Remarking on the limitations of the statute's text, the Third Circuit observed § 1110(a) "does not answer the question of whether [a service provider] has taken on fiduciary status in the

first place." *Santomenno*, 768 F.3d at 299.  These cases do not augur well for voiding as against public policy fee provisions in plan agreements.

Second, Plaintiff in effect argues that if ERISA does not prohibit service providers from relying on fee terms in contracts to avoid liability, then cases such as *Glass Dimensions* would not have found service providers were fiduciaries.  [*See* Tr. at 39].  But cases such as *Glass Dimensions* do find service providers are fiduciaries; therefore, Plaintiff argues, ERISA must prohibit service providers from relying on fee terms in contracts to avoid liability.  The argument's superficial appeal dissolves on deeper examination.  To be tenable, this argument must rest on a connection between courts finding service providers were fiduciaries, on the one hand, and § 1110(a), on the other.  None of the four district court cases on which Plaintiff relies discusses §1110(a) in reaching its holding.  These decisions therefore do not support a reasonable inference that §1110(a) was a reason for those courts finding the service providers were fiduciaries.  To the contrary, as noted above, those courts reasoned a service provider could be a fiduciary based on the terms of the service agreement, applying reasoning that is inconsistent with that of the Seventh and the Third Circuits.  *Santomenno*, 768 F.3d at 295 n.6.  The cases Plaintiff cites do not support the conclusion ERISA generally prohibits service providers from relying on fee provisions to avoid liability.

Finally, in deciding whether to apply a provision such as § 1110(a)  in these circumstances, courts must be sensitive to the consequences both for plan participants and for service providers. The Supreme Court has observed that in interpreting ERISA's fiduciary duties,

> courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place.

*Varity Corp.*, 516 U.S. at 497; *accord Dudenhoeffer*, __ at __, 134 S. Ct. at 2470. In other words, this Court must not upset the careful statutorily crafted balance "between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Dudenhoeffer*, __ at __, 134 S. Ct. at 2470 (citation and internal quotation marks omitted). Certainly one could envision that subjecting fee provisions to being voided would increase costs and litigation expenses on service providers. This, in turn, would discourage the plans from being offered, a result at odds with Congress's intent. *See Varity Corp.*, 516 U.S. at 497; *cf. Harris Trust*, 302 F.3d at 31 (concluding "there is nothing inherently inconsistent with the Contract's compensation provision and ERISA's fiduciary duty obligations"). If plans are discouraged from being offered, then the careful balance achieved by ERISA would be upset. For these reasons, the Court cannot under the circumstances of this case apply § 1110(a) in the manner urged by Plaintiff.

### f. Conclusion under 29 U.S.C. § 1002(21)(A)(i)

Consistent with the Seventh, the Third, and, indeed, the Eighth Circuits, the Court concludes Defendant in this case was not acting as a fiduciary at the time the fees and expenses were negotiated; therefore, Defendant owed no fiduciary duty in this regard. *See Renfro*, 671 F.3d at 324 (holding a service provider was "not yet a plan fiduciary at the time it negotiated" fees). This conclusion is limited, however. Courts applying this reasoning have done so under 29 U.S.C. § 1002(21)(A)(i) only. *See Santomenno*, 768 F.3d at 297 (holding that service providers were not fiduciaries "under subsection (i) of 29 U.S.C. § 1002(21)(A)"); *Leimkuehler*, 713 F.3d at 910 (noting the plaintiff's argument focused "on the second clause of subpart (i)"); *Hecker*, 556 F.3d at 583 (noting the plaintiffs argued that the service provider "exercised the necessary control to confer fiduciary status"); *see also Healthcare Strategies, Inc., v. ING Life Ins. & Annuity Co.*, 961

F. Supp. 2d 393, 401 (D. Conn. 2013) (observing *Leimkuehler* analyzed fiduciary status under "subsection one" only).  Plaintiff argues Defendant is a fiduciary under all three subsections of 29 U.S.C. § 1002(21)(A).  [Compl. ¶¶ 54, 55, 56].  Consequently, although the Court finds Defendant is not a fiduciary under 29 U.S.C. § 1002(21)(A)(i), it must next determine whether Plaintiff has pleaded facts plausibly showing Defendant is a fiduciary under the remaining two subsections.

2.  Whether Plaintiff Has Properly Pleaded Defendant is an ERISA Fiduciary

Defendant argues Plaintiff has failed to plead facts plausibly showing Defendant "was an ERISA fiduciary with respect to the challenged conduct."  [Def.'s Br. at 6].  As noted above, *supra* IV.B, Plaintiff alleges Defendant is a fiduciary with respect to the Plan and assets under 29 U.S.C. § 1002(21)(A)(ii) because it admits to being an investment advisor with respect to Plan assets.  [Accumulation Group Annuity Endorsement Rider at 6; Compl. ¶¶ 16, 54].  Plaintiff also alleges Defendant's authority to decide which separate accounts are offered and how much it will charge makes it a fiduciary under 29 U.S.C. § 1002(21)(A)(iii).  [Compl. ¶ 56].

Defendant asserts a "critical phrase" in ERISA's definition of fiduciary is "to the extent." [Def.'s Br. at 7]; 29 U.S.C. § 1002(21)(A).  Because of this phrase, Defendant continues, fiduciary status under ERISA "'is not an all-or-nothing concept.'"  *Bjorkedal*, 516 F.3d at 732 (quoting *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 192 (4th Cir. 2002)).  As noted above, the critical question in every case such as this is "whether that person was acting as a fiduciary . . . when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226; *see also Caremark*, 474 F.3d at 472–73 (noting a service provider must be "a fiduciary as that term is defined in the statute" and be "acting in its capacity as a fiduciary at the time it took the actions that are the subject of the complaint").

a.  Fiduciary status under 29 U.S.C. § 1002(21)(A)(iii)

Plaintiff argues Defendant is a fiduciary under 29 U.S.C. § 1002(21)(A)(iii) because it selects the separate accounts that will be available to plan participants.  [Pl.'s Br. at 11].  As noted above, a person is a fiduciary under § 1002(21)(A)(iii) "to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A)(iii). As Plaintiff notes, ERISA does not define "administration."  [Pl.'s Br. at 11].  The Supreme Court, drawing on common law meanings, has interpreted administration to include performing the duties imposed, or exercising the powers conferred, by the trust documents.  *Varity Corp.*, 516 U.S. at 502. Trust documents "implicitly confer such powers as are necessary or appropriate for the carrying out of the purposes of the trust."  *Id.* (citation and internal quotation marks omitted).  Plaintiff posits selecting the separate accounts to make available to plan participants is necessary or appropriate for carrying on the purposes of the plan, and so Defendant falls within the definition of administration. *See Healthcare Strategies*, 961 F. Supp. 2d at 401 (reasoning a service provider's contractual authority to change investment options granted it authority in plan administration and thus concluding the service provider was a fiduciary under § 1002(21)(A)(iii)).

Even assuming Defendant's authority to select which separate accounts to make available to plan participants brings it within the definition of administration, selecting the separate accounts must give rise to the alleged breach of fiduciary duty to support a finding of fiduciary status on this basis.  *See Leimkuehler*, 713 F.3d at 913 (explaining that to support a finding of fiduciary status the claimed breach must arise from the alleged fiduciary act); *Santomenno*, 768 F.3d at 296–97 (noting a claim for breach of fiduciary duty must plead "the defendant was acting as a fiduciary when taking the action subject to complaint" (citation and internal quotation marks omitted)).  In other words,

Defendant's selection of the separate accounts can support a finding of fiduciary status only if the alleged breach of a fiduciary duty arose from the administration of the separate accounts. *See Leimkuehler*, 713 F.3d at 913 (deducing that "AUL's control over the separate account can support a finding of fiduciary status only if Leimkuehler's claims for breach of fiduciary duty arise from AUL's handling of the separate account"). Or, using the formulation employed by the Third Circuit, there must be a "nexus" between the alleged basis for fiduciary responsibility, which here is selecting the separate accounts, and the wrongdoing alleged in the Complaint, which here is charging excessive fees. *Santomenno*, 768 F.3d at 296.

Defendant argues there is no connection between selecting separate accounts and allegedly excessive fees. [Def.'s Br. at 10]. Plaintiff responds that the two are "inextricably interwined." [Pl.'s Br. at 12 n.7]. The separate accounts harm Plan participants, Plaintiff insists, because Defendant "charges excessive fees in connection" with the accounts and the benefits provided by the accounts do not justify the fees. *Id.*

The court in *Santomenno* confronted a similar argument. 768 F.3d at 296–97. There, the plaintiffs alleged they were charged excessive fees. *Id.* at 296. The plaintiffs argued the service provider was a fiduciary because it retained the authority to change investment options and alter the fees charged. *Id.* at 296. The service provider's authority enabled it to change share classes for each fund into which plan participants' contributions were invested, which in turn affected the fees on the account. *Id.* at 289. Thus, the selection of accounts affected fees; nevertheless, the court reasoned the ability to change investment options and alter fees lacked "a nexus with the conduct complained of in the complaint," that is, the alleged excessive fees. *Id.* at 296. Because the court found the nexus lacking, it concluded the alleged ability to alter funds or fees could not support a

finding of fiduciary status. *Id.* at 297. As in *Santomenno*, Plaintiff alleges Defendant charged excessive fees. Here, too, Plaintiff contends the selection of accounts is connected to fees. Plaintiff, however, offers no reason for reaching a different result from that reached by Third Circuit in *Santomenno*, and the Court does not see one. The Court finds an insufficient nexus between the ability to select separate accounts and the alleged excessive fees. Accordingly, the Court concludes Defendant is not a fiduciary under 29 U.S.C. § 1002(21)(A)(iii).

b. Fiduciary status under 29 U.S.C. § 1002(21)(A)(ii)

Plaintiff's contention Defendant is a fiduciary under § 1002(A)(21)(ii) because it is an admitted investment advisor likewise fails. The court in *Santomenno* confronted, and rejected, this argument also. *Id.* at 297. There, as here, the alleged wrongdoing was the charging of excessive fees. *Id.* The plaintiffs there, like Plaintiff here, did not complain the investment advice was faulty. *Id.* To support a finding of fiduciary status, Plaintiff's claim would have to arise from Defendant's act in providing investment advice. *Leimkuehler*, 713 F.3d at 913. Plaintiff's claim it was charged excessive fees does not arise from the provision of investment advice. *See Santomenno*, 768 F.3d at 297 (rejecting alleged basis for fiduciary status because "[p]articipants allege the charging of excessive fees, not the rendering of faulty investment advice"). In the words of the Third Circuit, "this alleged basis of fiduciary responsibility bears no nexus to the wrongdoing alleged in the Complaint." *Id.* Accordingly, the Court concludes Defendant is not a fiduciary under 29 U.S.C. § 1002(21)(A)(ii).

## V.  CONCLUSION

Applying available authorities, the Court has performed a careful, holistic evaluation of the Complaint's allegations.  After doing so, the Court concludes Defendant was not acting as a fiduciary at the time the fees and expenses at issue were negotiated or at the time the agreement was entered into.  Thus, Defendant is not a fiduciary under 29 U.S.C. § 1002(21)(A)(i).  The Court also concludes the remaining acts alleged to support a finding Defendant was a fiduciary lack a nexus with the alleged excessive fees.   Thus, Defendant is not a fiduciary under 29 U.S.C. § 1002(21)(A)(ii) or 29 U.S.C. § 1002(21)(A)(iii).  Consequently, Defendant's Motion to Dismiss [ECF No. 34] is GRANTED and the matter is dismissed with prejudice.

IT IS SO ORDERED.

Dated this 10th day of December, 2014.


_____
STEPHANIE M. ROSE
UNITED STATES DISTRICT JUDGE